Good afternoon, Counsel. Thanks for being with us. So, it's my understanding we have Mr. Engel on behalf of Doe and Ms. Greenspan on behalf of the University. Is that correct? Yes, Your Honor. Yes, Your Honor. Alright, so Mr. Engel, the time is yours. Do you want to reserve any time for rebuttal, sir? Yes, Your Honor. I'd like to reserve three minutes for rebuttal if that's acceptable. Absolutely. And I'll tell you what, I have the clock here, so I'll give you a two-minute warning when you're closing in on your time. Alright? That's great. Thank you, Your Honor. Whenever you're ready, Counselor. Great. Well, may it please the Court, the District Court's decision to grant the motion to dismiss we believe was incorrect and should be reversed. The District Court incorrectly rejected John Doe's Title IX Selective Enforcement Claim and his Breach of Contract Claim. In particular, in regards to the Title IX Claim, the District Court primarily viewed the matter as whether the alleged victim in John Doe was a valid comparator. The District Court said they were not. We believe this is incorrect. Let me ask you something, Mr. Engel. Was it similar conduct or was it really very different conduct between Doe and the comparators? Your Honor, I believe it is similar conduct between Doe and the comparators. Now, when I say similar, of course, I'm relying upon the Title VII standard that's involved. And I would also add that we are here on a motion to dismiss, which means that it's a more relaxed standard because discovery might show exactly more details as to how they were. But I would suggest it's hard to imagine two more similar circumstances, especially when we're talking about Row 2. You have the same investigator involved. You have the exact same decision makers reading the exact same reports, which contain the exact same witness statements. And you have the exact same sexual encounter between the two parties and all the events that lead up to them. You have different views between Row and John Doe about what happened during that sexual encounter, but that's not part of the similarly situated analysis. A similarly situated analysis, I respectfully suggest, Your Honor, is an objective analysis. And when you look at those objective factors, time, place, decision makers, you have an almost identical, although I hate to use that word because I don't think you have to meet that standard, but you have really an almost identical situation in there. This is Judge Porter. Are Doe and Row 2 similar in the amount of alcohol that they consumed on that night? Well, Your Honor, the complaint itself says, I believe it's paragraph 90, let me get the exact page, paragraph 99 of the complaint, where it says that they were both drinking. That's on Joint Appendix, I'm sorry, Joint Appendix page 110. Paragraph 99, yes, Your Honor. Go ahead, sorry, go ahead. Oh, yeah, in paragraph 99 on page 110 of the Joint Appendix, it alleges that they have comparable intoxication of John Doe and Row 2, and alleges that the university applied the rules in a gender discriminatory manner. Paragraph 42 of the amended complaint, that's on page 99 of the Joint Appendix, indicates that they were both drinking. Now, what the district court did is it cited the paragraph 44 of the amended complaint, and this paragraph describes what John Doe perceived about Jane Row, indicating that she acted in a way that was consensual. And I really would suggest to the court that this is one of the big mistakes made by the district court, because the district court misread paragraph 44 of the amended complaint. Nothing in that paragraph indicates that John Doe either consented to the sexual activity that's described, or more importantly, that he had had any more or less alcohol to drink than Jane Row. So what you have, then, is the standing alone, the allegation in paragraph 98 and 99 that they are comparable. That's the allegation that should have been accepted as true, we believe, for a motion to dismiss standard, and that's the one that supports the Title IX claim. So when we look at that Title IX claim, then, Your Honors, let's start with where we agree. I'm sorry, what about Jane Doe 1, then? What's your argument on Jane Doe 1? Well, Jane Doe 1 is never addressed by the district court in the context of the selective enforcement claim. But here, I think, it really sort of tells where the university is coming from and what they are doing on these cases. The allegation of Jane Doe 1 is that she violated the retaliation provisions of the sexual misconduct policy. And in particular, she violated the provision that prevents the parties from talking about what's going on on these cases. They're not supposed to talk to anyone. It's supposed to be a completely confidential proceeding. And she violated that. The university was aware that she violated that. And even though they were aware that she violated that, they did nothing. They didn't take any action to look into whether she had done any wrongdoing. They didn't open up a new investigation. And we believe that this is important because it really underscores the context of what's going on in this complaint. As we described in paragraphs 9 to 15 of the complaint, schools, like the defendant in this case, were incentivized by the Department of Education to adopt policies that favored female complainants over male respondents. Paragraphs 93 and 94 of the amending complaint, for example, discuss the substantial criticisms of the schools received. Now, why is this important? Because the selective enforcement claim is more plausible given that context. It's not just a student, John Doe, who is complaining about unequal treatment. Rather, it's a student complaining about unequal treatment and offering a plausible reason to believe that his complaint would have a basis in the real world. So when your honor asks about Roe 1, what you have is a university that is invested in supporting alleged victims and supporting their stories, even when they do something wrong, and ignoring that. And I would note that this is different than the context of an amnesty provision. An amnesty provision, for example, where if the student admitted they had been underage drinking before the event, they wouldn't be prosecuted. Those would be typically applied equally to both sides anyway. But this is actions that occurred within the context of the investigation, and so would not fall under any kind of amnesty type situation. Is it your allegation that the investigator, the outside investigator, is the university's agent? I'm hesitating a moment, your honor, because I don't think the amended complaint speaks about it in those terms. Let me tell you why I ask. It follows up on the conversation we just had, because in paragraph 63 of the amended complaint, you say that the investigator permitted and even encouraged, as it were, collusion between Doe 1 and the other witnesses, or Doe 1 and Doe 2. And if that's the allegation, I just wonder how the investigator fits into this. Is she a neutral? Is she the university's agent? How does she fit in? Well, I want to try to answer that, your honor, if I may, without using the legal term agent. I think it may be easier to describe what we believe is going on here, which is that the investigator is acting at the direction of and in coordination with the university's Title IX coordinators. And so, in a typical situation, the investigator will keep the Title IX coordinator informed about what's going on, will use the Title IX coordinator at the school to help arrange for witness interviews, and take other actions like that. So I don't think your honor needs to find that they are an agent to show that they are acting, as we typically define that term in, say, contract law, to find that they are acting at the behest of the university, at the direction of the university, and more importantly, acting in a way that the university wants them to act. When the university, I would suggest, selects these investigators, they're not just picking random lawyers off the street, but they are selecting people who they believe will act in the way that the university wants to act, and act consistent with the preferences for outcomes that the university might have. In the time you have left, could you talk about your contract claim, and specifically how the university violated the contract with Mr. Doe? Sure. The university contract claim is based on a number of provisions in the contract that explicitly guarantee fairness. Does fairness necessarily involve a hearing, and what does that hearing look like? Yes, your honor. Our position is, under Pennsylvania law, fairness involves a notice and some form of hearing. This is, we suggest, the bare minimum necessary to protect against arbitrary deprivations by the school. So when you're talking about a hearing, you're talking about an opportunity to defend oneself, an opportunity to view the evidence that would be used against you, to respond to that evidence in real time, and an opportunity to, in some manner, question your accusers. This is what we believe the Pennsylvania courts were talking about in Rowan, where the courts said a private university was not obligated to provide a full-dress judicial hearing, subject to rules of evidence or representation by counsel, but that it must have some opportunity for a hearing. So I don't want your honor to think I'm dodging your honor's question by saying what this hearing would look like, but I don't think the court needs to decide what that hearing would look like and provide guidance for other schools going on to rule in our favor. Rather, I respectfully suggest that the court only needs to say there was no hearing in this case. You know, and hearings are very hard to define when you start to look at the case. You have about two minutes left. I'm sorry to interrupt. Thank you, your honor. You know, the challenge is hearings are almost, when you look at the case law, very few decisions say this is what a hearing is, because everyone kind of knows what a hearing is. And more importantly, I think it's enough to say we know what a hearing is not. A hearing is not an interview by an investigator. A hearing is not a lawyer meeting with someone in the room and saying what happened, and you tell them what happened, and you maybe provide a little bit of information to them, and then they go off and make a decision. But rather, a hearing, I think, involves some form of back and forth between that, some ability to look your decision-maker in the eye and know that they're hearing you, and more importantly, know what they're looking at from the other side. So I think you could leave for another day what particular process a school must provide to meet those bare minimums, but at the core of our breach of contract claim are these Pennsylvania cases saying that fundamental fairness involves notice and some form of hearing. And there's no question that there is no hearing provided in this particular case. Can you remind us, did Doe meet with the panel? My understanding was there was no panel, Your Honor. It was just an independent investigator who issued a decision on this case. I thought the investigator gave her report to an administrative panel, and it was the panel that decided the sanction. Well, the panel decides the sanction, but what I was referring to is the decision on whether wrongdoing occurred or not. Yeah, I get that. Did Doe ever meet with that administrative panel? I do not believe so, but I don't want to – please don't hold me to that 100%. I have to look at the complaint to make sure. I don't see it in the complaint. Judge May, did you have any questions, sir? Nothing from me, thank you. All right, we'll hear you back on rebuttal, Mr. Engel. Thanks. Thank you. Thank you, Your Honor. Ms. Greenspan, how are you? I'm doing very well, thank you, Your Honor. And you? Great, thanks. I'll do the same thing. I'll interrupt you when you have about two minutes left. Terrific, thank you. May it please the Court, good afternoon. My name is Leslie Greenspan, and I represent the APTLE, the University of the Sciences. Today, I'd like to address two main points with the panel. First, the district court properly dismissed Doe's Title IX selective enforcement claim when Doe failed to identify a valid comparator, a female who was similarly situated and was treated more favorably, and who failed to – Ms. Greenspan, let me ask you this. Didn't the university – wasn't it incumbent on the university investigator to follow up on any misconduct they became aware of, regardless of whether Doe brought it to their attention? Well, Your Honor, it very well may have been, but in this instance, as you can see from the investigative report, which is incorporated into the amended complaint, everything that Doe told the investigator was that this was consensual. Everything we did was consensual. Those are his words. And everything he describes in the amended complaint is that his interaction with Roe II, I believe, was consensual. So the investigator had no reason to look further or to make any further – to initiate any kind of proceeding against that complaint, because everything she had in front of her from Doe himself was that the interaction was completely consensual. That was his view. But I think that – isn't that wrinkle that the complaint says they were similarly intoxicated? And if they were, then he couldn't give consent any more than she could. Your Honor, if I may, the complaint's words are that – I want to find the exact paragraph that Your Honor is referencing. Ninety-nine. Ninety-nine. Thank you. That they were the comparable intoxication of both participants. So what he's alleging, to fairly read the allegations, both in paragraph 99 and elsewhere, he doesn't say that he was intoxicated. He does not say that he was incapacitated. But now, in this appeal, he is trying to now change his tune from everything that happened in real time at the time with the investigator, and now change it up to say, well, I was drunk too, and I was taken advantage of, and I was a victim. That is not what was happening at the time. And he does not allege that he was intoxicated. The words that he uses, again, the comparable intoxication of both participants, not I was intoxicated or she was more intoxicated. And, in fact, everything that he told the investigator, which, again, in the report itself, which is part of the record, is that he was, quote, buzzed, his own words to the investigator. I think, isn't that, I mean, it seems like what we're asking is that there was an allegation at the time of a mental or physical state that, by the university's own standards, could be sufficient to defeat the ability to consent. So why, at the time that this was alleged, was this not something that required the university to take investigative steps? In other words, it seems as though all the predicate facts that were necessary to at least examine this question were raised at the time of the hearing. Well, Your Honor, there's nothing to suggest that the investigator didn't consider it. And, in fact, when you look at the questions that were asked in the interview notes from both meetings that the investigator had with Mr. Doe, you see that questions were asked about his level of intoxication or his level of consent, and all of that was addressed. Again, he had given every indication that what he, what, I'm sorry, was there a question? Yeah, I was with Judge Porter. As I read that paragraph in 99, it seems to me, you can push, you're welcome to push back and you can talk to your colleague when he's back, but it seems to me that that's drafted very deliberately because I think, as I understand this case, his position is, we were, this was consensual. We both gave consent. But if, as the university, or as the investigator said, Roe too couldn't give consent because of the amount of drinking that she'd done, well, then I was comparable to her in that respect, and so I, even though my position is this was consensual, if she couldn't give consent, well, then I couldn't either because we basically had the same amount to drink. Your Honor, perhaps had he alleged that, had he articulated that, perhaps, but that's not what he's articulated here. He has not pled it alternatively as Your Honor has articulated it. He has simply said throughout the entire investigation process that it was, everything was consensual, everything. So for him to now, he has not alleged what Your Honor has suggested. You don't read paragraph 99 that way? No, Your Honor, I read paragraph 99 as the district court did to say he alleges that they had been drinking. And there's a big difference, as Chief Judge Sanchez of the Eastern District said, there is a big difference between someone was drinking to someone was so intoxicated that they were incapacitated and incapable of giving consent. But the complaint doesn't say they had both been drinking. The suggestion in 99 is that they were both intoxicated. Well, Your Honor, the words that are used in that particular paragraph 99, I'm only looking at after the part where it says they, quote, had been drinking. It says notwithstanding the comparable intoxication of both participants. So, again, it's not specifically saying it does not say what Doe now wants it to say, which is I was drunk too. I was taken advantage of. I was a victim. That is a new theory that he has. I think now I think what he's saying is if she was if she was couldn't give consent, then because of our comparable intoxication, not that I was drunk, but we were comparable in our level of intoxication. And if she couldn't give consent, well, then I couldn't either. So you should have investigated. See the difference? Well, Your Honor, I do. I do see the difference. But but the important piece for the court's analysis is they have to be similarly situated. And and in fact, what does that mean? With no mitigating circumstances that could differentiate or justify any kind of inconsistent treatment, assuming there was any. And in this case, you've got John Doe who was never I'm sorry. You've got John Doe who was accused by two separate people, two separate complainants of sexual misconduct versus and in Jane Roe to only I'll address and then I'll get back to Jane Roe one in just a moment. But Jane Roe to he never alleged that what he did was non consensual. He's still a complainant. Look at look at the sexual misconduct policy. Let's look at Section 1.3. Your Honor, she made the court's involvement. One point J.A. sixty five. Yes. And the first sentence says a complainant is an individual who is eligible to file a complaint to report a violation of the policy period. I think he's a complainant whether or not he actually filed a complaint. He's a complainant because he was eligible. And it's incumbent on the university to follow up, follow up with Judge Porter's suggestion. Isn't it true that it's the language it makes it incumbent on the investigator, the university to follow up on what they think might be a violation of the sexual policy, sexual misconduct policy? And they didn't. This has been pled at least. Well, Your Honor, it may have been to respond to both of your honors questions. That's not this case. That is not this case. He he was not a complainant. And when they use the term complainant as your honors look at the full policy and in its totality and in the individual provisions, there is a formal process in place here. And the process requires a formal complaint. And only once that's filed is an investigation triggered. I'm sorry, Your Honor. Doesn't it doesn't it also say throughout the policy, though, that if the university knows or reasonably should know that there was a violation that the university different places, it uses different words, but it can. It will. It might. It must conduct an assessment and investigation of its own. Yes, Your Honor. Does that about six or eight times? I think. Yes, Your Honor. We don't dispute that the university could or can do that, that they could initiate an investigation. We don't dispute that. That is a possibility. But under these facts, under this, these allegations under what was happening at the time in connection with the investigation, that wasn't what was before the investigator. That wasn't what was before these panels. That wasn't the counsel. Are we getting a little bit deep into the factual inquiry here? I understand your argument when you say or said earlier that Joe is offering a different theory in this complaint than was presented during the investigation. And I'll come back to why that's relevant a bit later. But but that's a quibble that would best be resolved at a later state in this litigation. Right. Let's assume you're right. That's a factual question and something that discovery will yield insights into. And you'll be able to raise that at a later stage in the proceedings. But I don't see how that's responsive to the argument now, which is based on what has been pled. Why isn't that sufficient to move forward? Your Honor, there's a couple reasons. The foremost of which is, as your honors have seen and as we put in our papers, Joe makes multiple allegations in his amended complaint that either reference or characterize the investigation, how things were done, how things happened. And noticeably failed to attach to his amended complaint a copy of the investigation report. We then, in our motion to dismiss, had to attach that investigation report because it was integral and relied upon and material to the allegations themselves. And the district court accepted that without converting this motion to dismiss into a motion for summary judgment. There are multiple examples, and I'll give you just the most obvious, which is times where John Doe has made allegations in the amended complaint that are blatantly contradicted by the investigation report. For instance, he alleges that the investigator did not meet with John Doe as much or as often as he met with the complainant. And yet, the investigation report specifically contradicts that. It cannot be the law in this circuit or frankly anywhere that a plaintiff is entitled to make arguments in an amended complaint, make allegations that blatantly contradict the document, then fail to attach the document, but then be rewarded by being permitted to survive a motion to dismiss because of misrepresenting the document. That just simply can't be the law. I can't accept that. So, our point is that the investigation report is a part of the amended complaint. So, no, the court need look no further than the allegations in the complaint with the documents that are integral and relied upon in connection with that amended complaint, which is the investigation report, among others. So, what about Jane Doe or Jane Roe, I'm sorry, Jane Roe 1, and her as a comparator? What's your position there? Jane Roe 1 is an even cleaner and simpler case than Roe 2. It was a violation of the policy nevertheless, correct? Well, it is now alleged that it was a violation of the policy. Yes, the same policy, but a totally different provision of the policy, totally different kind of conduct. So, you've got Doe who's accused of sexual misconduct with two different women versus Roe 1 who, in connection with this litigation now and this appeal, is accused of some sort of breach of confidentiality. Now, we've put in our papers. So, yes, those are completely different, and the court need look no further than cases such as USA, which I recognize is a Second Circuit case, but where the court is talking about selective enforcement under Title IX. And finding that that plaintiff, who was accused of sexual harassment, was not similarly situated from another male student who physically assaulted someone. Different conduct, couldn't be considered a comparator, couldn't state a claim for selective enforcement. I also note that in USA and multiple cases within this circuit, courts have stated that conclusory allegations are not enough. Legal allegations, conclusory allegations, fault allegations are not enough to survive a Title IX selective enforcement claim. So, counsel, perhaps, if I can, I'm sorry, counsel, I didn't mean to interrupt. I wanted to just follow up on your thought regarding the USEF decision. Is it true that other, in your understanding, that other circuits have taken a slightly different approach? For instance, the Seventh Circuit has looked at a framework that looks, at least at the motion to dismiss stage, whether the alleged facts are true, raise a plausible inference of sex bias. What are your thoughts about that standard as a rule of decision? Well, Your Honor, the Seventh Circuit, is Your Honor referring to the Doe versus Perdue case? Is that what Your Honor is looking at from Seventh Circuit? Yes, yes. The Seventh Circuit, I just want to take a quick look at my notes here, Your Honor, if I may. In the Seventh Circuit, in the Perdue case, it says, to state a claim, a plaintiff must allege sex, raising the inference that Perdue acted at least partly on the basis of sex in this particular case. Now, one of the things that the Perdue case does, the Seventh Circuit does, I believe, is that they adopt some sort of, I can't recall if this is the case, Your Honor, but I think they adopt some sort of Title VII type pleading, or perhaps I'm conflating my cases now. Right, it's more closely aligned with the Title VII analysis, that's correct. So my point is that, you know, you're raising, you're rightfully raising the USEF test, which originates, as you said, in the Seventh Circuit, but other courts, including the Perdue court, have taken a different tact. So it would seem as though we are not bound by one approach and could look at this a little bit differently, and I'm curious if you would have a different response if we were to analyze this case under the plausible inference test rather than the USEF formulation. Well, Your Honor, I'm not sure that it's totally inconsistent. I mean, the standard on the motion to dismiss, as the district court applied, is the Iqbal-Colombi standard, is a plausible claim stated. And in this case, the district court found properly, we believe, that the conclusory allegations that were set forth, the gratuitous gender bias phrases and such, were not enough to support these claims. And in fact, the district court shot down all three of the Title IX theories that were asserted at the time, only one of which is at issue in this appeal. So the pleading obligation doesn't necessarily change. Plaintiff here, though here, is still required to make a plausible showing to survive a motion to dismiss, which we believe he has not. So, Ms. Greenspan, we're all beyond your time, but I don't want to cut you off without giving you a chance to address the contract claim. Could you turn your attention to that for a moment? Yes, thank you, Your Honor. The breach of contract claim. John Doe was given the full offering of process and fairness that the university has set forth in its policy. And the cases make clear that what is set forth in the policy is what he's entitled to. That is how fairness is defined. And in this case, we have... So the university defines this as fair, and you can't quibble what we deem as fair. Is that your position? Well, not necessarily, Your Honor. Certainly, in a different case with different facts, the court could see that there was some fairness concern. But that's not this case. Because in this case, not only was an external, independent investigator brought in from the outside for the purpose of avoiding bias, as opposed to just having someone internally do the investigation. But that person was brought in, did a thorough investigation, interviewed both complainants, interviewed Doe twice. And during his second interview with the investigator, he had an opportunity to review her notes and findings from the first interview to make sure that they were correct. And to make corrections, which he did. He availed himself of that. He also had... Before you go on, since you were just talking about the investigator, why is the single investigator model consistent with the fairness that's promised in the contract? Well, Your Honor, I don't see any reason why, and I don't think that Doe makes any firm allegation as to why there was anything improper about a single investigator. In this instance, you had a single accused Doe. You have two separate acts of sexual misconduct that are alleged both to have occurred at his apartment off campus. You have... There was simply no reason... And these occurred within a few months of each other, both incidents. So there was no reason not to... In fact, it would have been extremely inefficient and possibly unproductive to hire multiple investigators to investigate these two... What about having a hearing? What about a hearing? Was there any sort of hearing here? Your Honor, there was no, quote, hearing in the traditional sense that Your Honors and we as lawyers are used to attending. But there was fairness here, even without such a formal, judicial, live, adversarial hearing. There was fairness because he not only had notice of the allegations, and notices, frankly, not even in dispute on this appeal, but he had opportunity to be heard every step along the way. I believe it was... One of Your Honors asked whether he was able to meet with the panel. I think that was Judge Porter. And the answer is, while he did not necessarily meet in person, he had an opportunity to provide written commentary, written statements, disagreeing with what the investigator had found and done, and disagreeing with the process. He had an opportunity to be heard every step of the way. And, Counselor, I certainly, if I could just interrupt because I know we're running short on time. I agree that that...I could agree hypothetically that that's a more efficient way to proceed. Efficiency is an unusual term to use, though, when we're talking about processes that surround deprivations of rights, whether they occur in contract or established in some sort of positive law. So what's your bottom line ground for why it is that the courts depart from the normal sense of the safeguards that are necessary to ensure fairness, and instead it applies, as you have called it, a standard of efficiency? Your Honor, I apologize if I misspoke. I wasn't suggesting that...my efficiency argument had to do with a single investigator as opposed to two investigators being brought in for each allegation. But to answer Your Honor's question, the law in this circuit, what we have...what the cases suggest is that opportunity to be heard is really what is material, what is significant. And he had that here. He had it every step of the way. And the district court outlined all the ways he had it, and we outlined that in our brief as well. He got everything to which he was due under the university's policy. And he had fairness. He had a thorough and fair investigation and opportunity to be heard every step of the way. Thank you, Ms. Greenspan. Thank you, Your Honor. Judge Ford or Judge May, do you have any other questions? No, sir. Nothing further. Okay, thank you. Mr. Angle? Oh, sorry. Sorry, Your Honors. I had to take it off mute. Your Honors, first, if I may, I do have an answer to the specific question about whether our client spoke with the hearing panel. One of the advantages, perhaps, of doing this electronically is I could reach out to my co-counsel while I had some time. I'd note that paragraph 74 of the amended complaint discusses what happens at the hearing panel. And the section of the policy is found at joint appendix page 139, section 2.11, where it talks about the hearing panel. And that policy provision suggests that there is no opportunity for John Doe to appear at that. And I was able to confirm that John Doe did not appear before the hearing panel. I think it is, Your Honor. Mr. Angle, let me ask you. Ms. Greenspan made a very powerful argument that the investigation report attached to the complaint are in tension. What do you make of that argument? I think the tension is perhaps overblown, Your Honor. And the reason is there is a big difference between a legal pleading and a statement or notes of a statement, really, because the recorded statements are not part of the record, but notes of a statement made by a lawyer of an interview with a college student. When a college student talks about being – things are consensual. A college student does not have the legal background or the legal training to understand what may be the subtleties of the law. He says it's consensual because he's being asked, did the other person consent? And he's saying, yes, they did consent. But it's hard and I think really unfair to suggest that a college student is held to the exact languages he uses as he's sitting alone in this interview with a trained lawyer and that that could somehow modify what is in an amended complaint. What we need to look at is that the amended complaint. And I think if you really dig into this idea of consent and intoxication, you see where that tension really comes from. Because the school – I'm sorry, if there's a question, I'll pause. No, go ahead. The school is asking a question about whether a student can provide valid consent even if every other indicator is that things are consensual because the person providing those valid indicators was too intoxicated. This means that a student is saying yes and acting in a manner consistent with consent. The school is still going to dig into that, look into how much they had to drink to see whether those outward manifestations are still valid. So when he's talking about consent in that investigative report, he's not talking about it in the same way that we're talking about it in the complaint itself. You know, I think what they're referring to specifically is a comment on page 252 of the joint appendix where John Doe says he was buzzed but not drunk. Now, the question, is this a violation of the policy? Possibly, but we don't know on this record because those terms are subjective. So you have to accept the allegation of the amended complaint that he was comparably intoxicated to row two. As the court pointed out, the school has an obligation when it starts to get this information, suggesting that there could be misconduct, to dig further. And they don't do this with John Doe. They simply accept his statement at face value, say we don't have anything to look at here, and move on. Thanks. I think we understand where you're coming from. Judge Mady, Judge Porter, any other questions? No. Nothing further. Mr. Angle, thank you very much, sir. Thank you, Your Honor. Ms. Greenspan, thank you very much. Thank you, everybody, for accommodating us during these unusual times. And thanks for your arguments and your wonderful briefs. We'll take this case under advisement and get back to you in the not too distant future.